KINNEY LAW, P.C.
CHRISTIANE C. KINNEY (SBN 199056)
D. BURGUNDY MORGAN (SBN 199962)
8023 Beverly Blvd., Suite 1568
Los Angeles, California 90048
Telephone: (310) 751-0354
E-mail:  christiane@ckinneylaw.com
E-mail: burgundy@ckinneylaw.com

Attorneys for Plaintiff
BETH FIEGER FALKENSTEIN *dba* "THE KNACK"

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| BETH FIEGER FALKENSTEIN *dba* "THE KNACK",<br><br>Plaintiff,<br><br>vs.<br><br>PRESCOTT NILES, an individual; ROCKY KRAMER, an individual; MATT STARR, an individual; THOMAS LOWREY, an individual; "PRESCOTT NILES' THE KNACK PARTNERSHIP," a business entity of unknown capacity and domicile; and DOES 1 to 35, inclusive,<br><br>Defendants. | Case No. 2:26-cv-07078<br><br>**COMPLAINT**<br><br>**1.  DECLARATORY AND INJUNCTIVE RELIEF TO QUIET PLAINTIFF'S TITLE AND EXCLUSIVE RIGHT TO COMMERCIAL USE OF THE NAME AND MARK "THE KNACK"**<br><br>**2.  FEDERAL TRADEMARK INFRINGEMENT [Lanham Act, 25 U.S.C. § 1114];**<br><br>**3.  FEDERAL FALSE DESIGNATION OF ORIGIN, FALSE ASSOCIATION, AND PASSING OFF [Lanham Act, 15 U.S.C. § 1125(a)];**<br><br>**4.  FEDERAL UNFAIR COMPETITION [Lanham Act, 15 U.S.C. § 1125(a)];**<br><br>**5.  CALIFORNIA UNFAIR COMPETITION [Bus. & Prof. Code § 17200];**<br><br>**6.  CALIFORNIA FALSE ADVERTISING / TRUTH IN MUSIC ADVERTISING PREDICATE [Bus. & Prof. Code §§ 17500, 17537.12]**<br><br>**7.  BREACH OF WRITTEN CONTRACT** |

**8. COMMON LAW TRADEMARK INFRINGEMENT**

**9. COMMON LAW UNFAIR COMPETITION / PASSING OFF**

**10. CONTRIBUTORY AND VICARIOUS TRADEMARK INFRINGEMENT**

**11. FEDERAL TRADEMARK DILUTION [Lanham Act, 15 U.S.C. § 1125(a)];**

**12. SLANDER OF TITLE**

**AND DEMAND FOR JURY TRIAL**

NOW COMES the Plaintiff, BETH FIEGER FALKENSTEIN, and complains and alleges as follows:

## JURISDICTION AND VENUE

1.  The within action is brought under, *inter alia,* the Lanham Act, 15 U.S.C. §§ 1051, et seq., and presents a Federal question.

2.  This court has jurisdiction over this matter pursuant to 15 U.S.C. § 1121, and 28 U.S.C. §§ 1331, 1332, 1338 and 1367. Venue in this district is proper pursuant to 28 U.S.C. §§ 1391, 1392, and 1400(a) because Defendants, upon information and belief, maintain their principal residence within Los Angeles County, and a substantial part of the events and omissions giving rise to the claims herein occurred in this district or there is no district where the action may otherwise be brought, and at least one of the Defendants is subject to personal jurisdiction in this district at the time this action was commenced.

## PARTIES

3.  Plaintiff BETH FIEGER FALKENSTEIN ("Plaintiff") is a citizen of the United States maintaining her principal residence in the State of Oregon. Plaintiff is the sole successor-in-interest to The Estate of Doug Fieger, and the sole beneficiary of The Douglas L. Fieger Trust dated August 2, 2006, which includes Doug Fieger's right, title, and interest in "The Knack".

4.  Defendant PRESCOTT NILES is an individual who maintains, and who at all

times hereto relevant has maintained, his principal residence and place of business within the County of Los Angeles, California.

5.     Defendant ROCKY KRAMER is an individual whom Plaintiff is informed and believes maintains, and who at all times hereto relevant has maintained, his principal residence and place of business within the County of Los Angeles, California.

6.     Defendant MATT STARR is an individual whom Plaintiff is informed and believes maintains, and who at all times hereto relevant has maintained, his principal residence and place of business within the County of Los Angeles, California.

7.     Defendant THOMAS LOWREY is an individual whom Plaintiff is informed and believes maintains, and who at all times hereto relevant has maintained, his principal residence and place of business within the County of Los Angeles, California.

8.     Defendant "PRESCOTT NILES' THE KNACK PARTNERSHIP" is a business entity of unknown form and domicile, which Plaintiff is informed and believes maintains its principal offices and place of business within the County of Los Angeles, California.

## FICTITIOUSLY NAMED DEFENDANTS

9.     Plaintiff is currently unaware of the true names and capacities of the Defendants named herein as DOES 1 through 35, inclusive, or has insufficient evidence, prior to discovery, to fulfill the obligations imposed by Rule 11 of the Federal Rules of Civil Procedure in respect to individuals and entities known to Plaintiff, wherefore Plaintiff sues such Defendants by said fictitious names. Plaintiff is informed and believes, and thereon alleges, that Does 1 through 35, inclusive, include persons and entities who knew or had reason to know of the infringing conduct alleged herein and who nevertheless participated in, facilitated, induced, enabled, materially contributed to, controlled, profited from, or otherwise benefited from that conduct. Plaintiff will amend this Complaint to allege the true names, capacities, roles, and legal responsibility of such Doe Defendants when ascertained through further investigation and discovery.

## GENERAL ALLEGATION OF AGENCY

10.     Plaintiff is informed and believes, and based on such information and belief alleges, that each of the within Defendants, or one or more of them, and each of them, were the

officers, agents, servants, employees, or attorneys of one or more of the named Defendants herein, acting within the course and scope of such relationship and in active concert or participation with one or more of the remaining Defendants, in connection with the acts and/or omissions alleged herein, or were in privity with, represented by, or subject to the control of one or more of the remaining Defendants named herein.

11. Plaintiff is informed and believes, and based on such information and belief alleges, that at all times hereto relevant Defendant "PRESCOTT NILES' THE KNACK PARTNERSHIP" was and is, or was created, and is maintained and operated as, an alter ego of and for the benefit of Defendants PRESCOTT NILES, and as a repository and conduit of their respective personal assets, so commingled with the personal affairs and assets of said individual Defendants as to negate any legal fiction of separate identity or capacity, and to eliminate any shield with respect to said individual Defendants' personal liability based on such legal fiction.

## GENERAL ALLEGATIONS OF MATERIAL FACT

### A. Historical Ownership and Use of "The Knack" and Inheritance of Same

12. Doug Fieger ("Fieger") was the founding member and lead singer of the musical band which was advertised, performed in public, and recorded commercially-released phonorecords under the trade name "The Knack". As further set forth hereinbelow, Fieger was always the sole owner of the name "The Knack". Fieger recorded and performed as The Knack for more than 30 years until his death in 2010. Fieger also owned the trademark in "The Knack" pursuant to Reg. No. 1,162,242 (Class 41) registered in the United States Patent and Trademark Office as of July 21, 1981. Fieger also held nationwide common law rights by reason of his continuous use in commerce throughout the United States from and since approximately 1978, and unquestionably since 1979.

13. On or about February 22, 1979, Fieger, Berton Averre ("Averre"), Bruce Gary ("Gary") and Prescott Niles ("Niles") signed a recording agreement with Capitol Records ("Capitol") with respect to their exclusive recording services in the group professionally known as "The Knack" ("the 1979 Recording Agreement"). The 1979 Recording Agreement, together with any and all amendments thereto and directly related licenses and agreements between the

parties shall be collectively referred to herein as the "Recording Agreement."

14. At the time Fieger, Averre, Gary and Niles signed the Recording Agreement, Fieger owned all of the rights to the name "The Knack" and Fieger, Averre, Gary, and Niles so represented and warranted this fact in the Group Supplement to the Recording Agreement. (Group Supplement, ¶ 1.b.).

15. The Group Supplement provided that "if either Doug Fieger or Berton Averre leaves the Group, and a mutual agreement cannot be reached as to a replacement therefor, Capitol may elect to terminate the engagement of the remaining members of the Group by notice in writing"; however, it stated "Capitol may not terminate the Agreement on the basis that the drummer or bass player (currently Bruce Gary and Prescott Niles, respectively) leaves the Group or otherwise refuses, fails, or neglects to perform for Capitol under the Agreement." (Group Supplement, ¶¶ 2.a., 2.c.). The Group Supplement further provided that "[i]f the Agreement is not terminated entirely under Paragraph 2.a. of this Group Supplement, (i) the members of the Group whose engagements are terminated shall not use the professional name of the Group in any commercial or artistic endeavor; (ii) the said professional name shall be and remain the property of Doug Fieger …." (Group Supplement, ¶ 2.c.).

16. On or about January 26, 1981, CPA Neal Levin sent a letter to Capitol Records documenting that Scott Anderson had resigned as manager of The Knack, effective as of December 15, 1980, in an effort to settle up some accounting prior to his resignation.

17. On or about February 12, 1982, Gary, Niles, and Averre (the "Former Members") terminated their membership in The Knack and instructed the group's attorney to notify Capitol that they were "Leaving Members" under the Recording Agreement.

18. After February 12, 1982, with the knowledge of and without objection from any of the Former Members, Fieger continued to operate the business of The Knack as a sole proprietorship, and owned all right, title and interest in and to all intellectual property in connection with The Knack, including without limitation, all copyrights (including master recordings, videos, photos, artwork and other materials), trademarks, servicemarks, logos, dbas, etc. Fieger actively entered into recording and license agreements, enforced legal rights, and

collected all monies payable to The Knack under the Recording Agreement, paying to each of the Former Members twenty-five percent (25%) of the net proceeds (after deduction of expenses) that Fieger received in connection with the recordings that Fieger and the Former Members performed together as a group pursuant to the Recording Agreement (the "Group Recordings"). For the avoidance of doubt, the Group Recordings included solely those master recordings originally embodied on the long-playing phonorecords featuring the performances of The Knack entitled "Get The Knack," "…but the little girls understand," and "Round Trip."

19.     Following Fieger's death in February of 2010, Plaintiff inherited all such rights in and to the business operations, intellectual property and bank accounts of "The Knack", subject only to the limited obligation to pay a pro-rata share of net receipts derived specifically from the Group Recordings. Capitol recognized Plaintiff as Fieger's successor and began accounting solely to Plaintiff for "The Knack." Later, on or about July 22, 2013, a Settlement Agreement and General Release ("Settlement Agreement") was entered into between Plaintiff, Averre, Niles, and Capitol, further amending the Recording Agreement retroactively increasing the percentage paid for digital downloads from and after October 1, 2012, with Capitol paying and accounting solely to Plaintiff, and Plaintiff paying Averre, Niles, and the Gary Estate their share of the settlement funds. Plaintiff has continued without abatement to conduct the business of "The Knack" from Fieger's death to the present, including without limitation, releasing new albums, maintaining the website, handling merchandise sales, fielding media requests for interviews, and accounting to the Former Members related to the Group Recordings. Plaintiff also owns, by way of inheritance from Fieger, the trademark in "The Knack" pursuant to Reg. No. 4,509,278 (Class 009 for audio recordings featuring music; musical recordings; musical sound recordings; network video recording software for IP [internet protocol]) registered in the United States Patent and Trademark Office as of April 8, 2014, noting first use in commerce (via Fieger, whose rights Plaintiff inherited) as of December 31, 1979.

### B.     Defendants Start Using the Protected Mark

20.     Despite Niles voluntarily and expressly abandoning any purported right to ever use the name "The Knack" commercially upon leaving the band in 1982, and despite never

having previously asserted any rights to the name either before or after Fieger's death in 2010, on or around February 26, 2026, a social media poster image of Niles and three other individuals began circulating online, with  a small white font "Prescott Niles'" and "THE KNACK" in large font, stating "Prescott Niles and his Knack At the Canyon Club May 2, 2026."

21. In or about March of 2026, Niles started an Instagram account @prescottnilesknackofficial with the wording "Prescott Niles' THE KNACK OFFICIAL" announcing live shows featuring Niles on bass, Matt Starr ("Starr") on lead vocal and rhythm guitar, Rocky Kramer ("Kramer") on lead guitar and backup vocals, and Gabe Niles ("G. Niles") on drums. Upon information and belief, Niles or others acting under his direction and control also started an Instagram account called @theknackband using a profile image simply stating "The Knack", and announcing upcoming shows at The Canyon Club and the Strat Hotel & Casino in Las Vegas. Each of the three images on this account used the hashtag #TheKnack. G. Niles was later replaced by Defendant Thomas Lowrey ("Lowrey").

22. On March 11, 2026, Defendant Starr posted on Instagram, "Yes, I'm the new singer for The Knack", and using the hashtags #TheKnack and #MySharona.

23. On March 12, 2026, Defendant Kramer posted a talk show interview on the phone with Defendant Niles. Niles stated "Besides being a former Knack and now a current Knack member, we re-formed The Knack and I'm delighted that you will be lead guitarist and vocalist at Prescott Niles' The Knack." Defendant Kramer tried to emphasize "Prescott Niles' The Knack" after Niles' comment, but ended the video with "We're bringing the Knack back, The Knack is back" and played out the recording with part of the original The Knack recording of "My Sharona."

24. On or about March 13, 2026, Defendants Niles and Kramer shared social media posts announcing "Prescott Niles' The Knack" would be performing live at The Canyon Club on May 2, 2026. and at the The Strat Hotel & Casino in Las Vegas, NV on June 6, 2026, using the hashtag #TheKnack, #theknackisback, and #mysharona, a hit song by the original group, written by Fieger and Averre. In the poster images for both social media posts, the name Prescott Niles' appeared in smaller font, with THE KNACK in all capital letters.

25.    On March 14, 2026, Defendants Niles, Kramer, and Starr, collaborating with The Canyon Club's Instagram, shared an original Knack pin from 1980, encouraging people to purchase tickets to the show in order to enter a raffle to win the pin.

26.    Leading up to the Canyon Club show, a press article was posted on or about April 30, 2026 with a picture of Defendants Niles, Kramer, Starr, and G. Niles only showing the name "The Knack" in the photograph, with the headline stating, "THE KNACK Is Back, With ACE FREHLEY/MR. BIG Drummer MATT STARR On Vocals." Other press articles were being posted around the same time featuring pictures of the original band including Fieger, and reporting that The Knack was returning with a new lead singer.

27.    Shortly before May 2, 2026, the Canyon Club in Agoura Hills put out a billboard off the 101 Freeway referencing that "The Knack" would be performing there.

28.    On May 1, 2026, the night before the May 2, 2026 show at The Canyon Club, Defendant Starr posted an image of his drum kit with the name "The Knack" prominently displayed, using hashtags #TheKnack and #MySharona.

29.    At the May 2, 2026 show at The Canyon Club, the venue announced the new band as "The Knack." Immediately following the show, Plaintiff started receiving complaints from fans of The Knack who seemed confused. One fan complained, "Well saw you guys last night. I see a lot of concerts here in LA so my expectations for the price may be higher. My ticket with no dinner was $66.00. You only played for an hour. That's what you should warn people about if you know you only have one hour worth of music. Do covers of Led Zeppelin or something to have a complete show. Or don't tour until you do…. Your show at the canyon should have been $20. Glad I didn't buy a table seat that required dinner but I would have bought a standing GA ticket if I knew it was just an hour. Standing was about $35 and why did it jump to $66 for a seat for just a 1 hour show.. misleading – we expected a regular concert. I'd like a 50% refund." When told that it was not "The Knack," the fan still complained "…the band should care that their fans had this experience at one of their shows. No of course not all the same members but they are still calling themselves The Knack. Change the name if they want different expectations than the original band." Another fan wrote, "I'm excited for Prescott's project however me being

a musician I was quite critical on their performance , it was rough at best. Needs a lot of rehearsals before going before an expecting audience boys …"

30.     Following the Canyon Club appearance, Yaniv Raphael Bar posted photographs of the show at the Canyon Club, including the drum kit which solely featured the name "The Knack" with the two small k's as originally designed by Fieger.

31.     On or about May 3, 2026, Defendant Lowrey shared a post, "The Knack is BACK! It was an honor to play & to have the great @prescottnilesknackofficial, @mattstarrmusic & @rockykramer up there with me," posting a video clip of the performance, using the hashtag #theknack.

32.      On May 6, 2026, Defendant Starr posted a social media poster for a gig at The Strat which only said "The Knack." On or about May 15, 2026, Defendant Starr posted a photo of a pile of guitar picks with his name on one side, and "The Knack" on the other, using the classic logo with two extended small "k's" as created and designed by Fieger, promoting the upcoming show at The Strat in Las Vegas, using the hashtag #TheKnack and #MySharona. Defendant Starr later removed these posts.

### Enforcement Efforts Before and After the Canyon Club Show

33.     Shortly before the Canyon Club show, Plaintiff was made aware of Defendants Niles' actions and started reaching out to him, but Defendant Niles ignored Plaintiff's messages.

34.     On May 15, 2026, Plaintiff, by and through her counsel of record, caused a "cease and desist" letter to be sent to Defendant Niles, asserting that he was infringing on the band name and registered mark, along with other protected IP, which was causing confusion to fans. Plaintiff's letter further explained that Defendant Niles had no right to continue his commercial use of the name and mark, The Knack, for his performances, as supported by the historical agreements and other documentation. Notwithstanding the violations, Plaintiff indicated that if Defendant Niles complied with the demands to take down and immediately cease further usage of certain confusing social media accounts and use of the The Knack logo designed by Fieger, Plaintiff would be open to considering some alternate band names that would avoid consumer confusion, in order to protect the legacy of the original band, while allowing Defendant Niles to

perform music under appropriate parameters.

35.     Also on May 15, 2026, attorney Ashley Posner sent a letter in the U.S. Mail to Plaintiff's attorney, stating "Mr. Niles will not tolerate interference with his performances under The Knack name", issuing a cease and desist letter to Plaintiff in an attempt to prohibit her from contacting promoters, booking agents, venues, or other third parties who were unlawfully using the name she inherited from Fieger, threatening to seek cancellation or restriction of her registered mark, and proposing a short-form non-interference/coexistence agreement.

36.     Another letter from Posner followed on May 19, 2026, stating he represented Defendant Niles, and that his client denied giving authorization to send notice to Capital in 1982 that he was a "leaving member," and further denying that Defendant Niles ever signed a declaration acknowledging Fieger's ownership and Niles' lack of rights in the name. In the letter, Posner indicated the takedown demands were rejected.

37.     On May 21, 2026, Plaintiff, by and through counsel, voluntarily provided certain historical documentation that further explained why Defendant Niles could not do what he was doing by contract, as acknowledged in his own declaration from 2012. Posner's response, on May 22, 2026, was to claim forgery, and to send a preservation letter, again stating their intent to commence litigation in federal court or before the Trademark Trial and Appeal Board ("TTAB"). Importantly, the Settlement Agreement relied upon and reiterated statements made by Niles in his declaration from 2012, and Niles also signed the Settlement Agreement and accepted a payment thereunder.

38.     On May 28, 2026, Plaintiff, by and through counsel, responded to Posner's letter, acknowledging their intent to preserve records in this matter, and to let Posner know that other witnesses can confirm the events surrounding the declaration and agreements, and that we would not stand for Defendant Niles making a mockery of the legal process. A preservation letter was sent back, along with a good faith offer that would permit certain performances without utilizing "The Knack" independently, or in a manner that would cause confusion.

39.     While Plaintiff's exclusive ownership and control of the mark is incontestable, because more than five years had passed since the date of registration, and Defendant Niles no

longer had any legal right to challenge Plaintiff's exclusive ownership of the mark, Plaintiff nevertheless continued her efforts to resolve the matter in good faith in advance of her initiating this litigation, based on years of having a professional and amicable relationship with Defendant Niles prior to the above actions.

40.     Between the show at the Canyon Club and the show at The Strat, counsel for Niles and Plaintiff explored the possibility of a temporary agreement granting Niles permission to use the name "Prescott Niles' The Knack" under a non-exclusive license, on the condition that he and his band and other third parties under his direction and control would conform to certain standards, never utilize "The Knack" independently of "Prescott Niles'", and police third parties who did, while the parties explored the possibility of a long-term resolution. Unfortunately, while counsel for the parties were in the process of negotiating a temporary agreement in good faith, Defendants demonstrated their utter inability to comply with Plaintiff's good faith requests to avoid sewing brand confusion, so discussions ended without an agreement in place.

41.     On June 4, 2026, Defendant Kramer posted a social media poster image for their upcoming show at The Strat in Las Vegas, with the name Prescott Niles' appearing in smaller font, and The Knack taking up three times the space. The image appeared to be generated by AI, with the skinny tie look and the pink and black color schemes utilized as major The Knack identifiers, sewing further confusion in their promotions. After reporting Plaintiff's concerns to Posner, by and through counsel, Posner rejected her request for the inclusion of reasonable language that Defendant and his band not intentionally sew confusion, stating that Plaintiff "does not control anything beyond her existing trademark rights for recorded music and cannot dictate band costuming, much less a cartoon character's clothing, tie width, or generalized color schemes as though she owns the band's personal 'image'. Our client has already agreed to the 'Prescott Niles' The Knack' identifier to address the source-identification dispute concerns, and that should be the sole focus of any cooling-off period."

42.     The night before the show at The Strat, Defendants Niles and Lowrey appeared on More Fox 5 in Las Vegas. During the interview, the news reporter says, "How does it feel to be playing with The Knack"? Neither Defendant Niles nor Defendant Lowrey corrected him. During

the interview, Defendant Niles further fanned the flame by insinuating that he was at Fieger's bedside when he died, which was not true. The reporter then stated, "You guys obviously kept the band going, and it's with you now." Again, Defendant Niles made no effort to correct. Instead, Defendant Niles said that his manager and agent started to talk to him and said he was contemplating doing this for a while but it didn't feel right, but now it felt right.

43.     On or about June 6, 2026, Defendant Starr posted on Facebook "The Knack pre-show selfie. Show 2 in Vegas." Defendant Thomas Lowery posted on Instagram "The knack is backkkkk" stating "looking forward to hitting the stage for the return of The Knack alongside @prescottnilesknackofficial @mattstarrmusic @rockykramer".

44.     A Facebook page of them performing at The Canyon Club was used as the cover photo, prominently displaying "The Knack" on the drum kit. The same image was propagated for future show announcements, despite good faith discussions indicating such a marker could not be utilized on a drum kit or in any other fashion independent from "Prescott Niles'". While other imagery on Facebook used Prescott Niles' The Knack, "The Knack" was prominently displayed, while "Prescott Niles'" was approximately 1/4th the size (and in some cases cropped out completely due to application parameters), with the drum head "The Knack" still prominently displayed in promotional photos.

45.     Despite not having any formal agreement in place, Defendants announced new shows on a website called bandsintown.com, including Deep End Live in Redondo Beach on September 11, 2026, Sweet in Des Plaines, IL on September 24, and The Sands 2026 in Cancun Mexico on October 20-25, 2026.

46.     On or about June 10, 2026, The Sands posted on its Facebook account, "We welcome The Knack to the sandbox 2026!" That post was re-shared on the Prescott Niles' The Knack Facebook page without any clarification or correction.

47.     Video of a performance by "Prescott Niles' The Knack" in Las Vegas, uploaded on YouTube by "MuZiKinG I.E" references only "The knack - MY SHARONA – 'live' 6-6-2026 80s pool party at the stratosphere . Last vegas NV" with comments turned off, further demonstrating consumer confusion resulting from the show and the promotion surrounding it.

48.     Plaintiff is informed and believes, and thereon alleges, that Defendants adopted an aggressive, adversarial position related to threats of cancelling Plaintiff's valid trademark registration, with the ulterior motive of coercing Plaintiff into allowing Niles to use the name, contrary to the historical agreements and clear ownership rights. Fieger, who sang all of the lead vocals on all of The Knack's hits, enjoyed a continuing, uninterrupted, successful career performing as The Knack prior to his death, and entrusted Plaintiff, his sister, to carry on the legacy of the name. She has done so continuously since Fieger's death, protecting his legacy and the band name, business, and IP rights that he entrusted to her. Conversely, Plaintiff is informed and believes, and thereon alleges, that Defendants have been successful in booking shows as "Prescott Niles' The Knack" solely because of their use of "The Knack" name while performing cover versions of the songs made famous by Fieger, which are the essence of the goodwill associated with the mark. Absent Fieger's distinctive lead vocals, Defendants have allowed and encouraged third parties to refer to them as "The Knack" for the express purpose of sewing brand confusion and confusing the fans. Further, the proposed "standstill agreement" would have allowed abuse to continue happening while unfairly tying Plaintiff's hands with respect to her ability to police erroneous third party references to the band. While negotiating such an agreement, Defendant Niles and others offered no corrections or clarifications to such third parties, demonstrating bad faith and a willfulness to confuse the public.

49.     Plaintiff's efforts to negotiate temporary permission and a license to Defendant Niles, allowing him non-exclusive use of "Prescott Niles' The Knack," was at all times conditioned and dependent upon said Defendants maintaining the integrity of that mark, not using "The Knack" independently, and being willing and able to police and enforce the same protective measures with third parties. Plaintiff is informed and believes that said Defendants failed to adequately operate in good faith during the negotiations of these terms, wherefore Plaintiff cancelled such negotiations and any purported temporary license to use the name in any regard, and hereby demands that said Defendants, and each of them, immediately cease and desist all commercial use of Plaintiff's famous name and mark, "The Knack."

50.     Plaintiff has at all relevant times since Fieger's death owned the goodwill

associated with the said name and mark, The Knack, in that consumers associate the name and Fieger's distinctive voice and singing style with recordings by The Knack, on all of which recordings Fieger was the lead singer.

51. The Knack's recordings and live performances are parts of a single business enterprise in the public mind. (See Turner v. HMH Publishing Co., Inc. (1967, 5th Cir.) 380 F.2d 224, 228-29; see also, Giammarese v. Delfino (1977, N.D. Ill.) 1977 U.S. Dist. LEXIS 13720, 197 U.S.P.Q. 162, 163.)

52. The goodwill associated with Fieger's ongoing and continuous business enterprise, as carried on by Plaintiff following Fieger's death, from and since not later than 1979, is inseparable from the mark, The Knack. (See, Hy-Cross Hatchery, Inc. v. Osborne (1962, C.C. P.A.) 303 F.2d 947; Defiance Button Machine Co. v. C.&C. Metal Products Corp. (1985, 2nd Cir.) 759 F.2d 1053 cert. denied (1985) 474 U.S. 844; Marshak v. Green (1984, 2nd Cir.) 746 F.2d 927; J. Atkins Holdings Ltd. v. English Discounts, Inc. (1990, S.D.N.Y.) 14 U.S.P.Q.2d 1301. See also, United Drug Company v. Theodore Rectanus Co. (1918) 248 U.S. 90, 97; "There is no such thing as property in a trademark except as a right appurtenant to an established business or trade in connection with which the mark is employed.")

53. Wherefore, by the instant complaint, Plaintiff seeks, and is entitled to have, declaratory relief and other relief, in equity and in law, as against the Defendants named herein, as more fully set forth hereinbelow:

## CLAIMS AND CAUSES OF ACTION

### FIRST CLAIM FOR RELIEF

**Declaratory and Injunctive Relief to Quiet Plaintiff's Title and Exclusive Right to Commercial Use of the Name and Mark "THE KNACK"**

**Against All Defendants**

54. Plaintiff refers to, realleges, and incorporates by reference each of the allegations set forth above and below as though fully set forth herein.

55. An actual, present, and justiciable controversy exists between Plaintiff and Defendants concerning ownership, control, and the exclusive right to commercially use the name

and mark THE KNACK.

56.    Plaintiff contends that she is the exclusive owner of all right, title, and interest in and to the name, mark, goodwill, business rights, and commercial rights associated with THE KNACK, by inheritance from her brother, Doug Fieger.

57.    Defendants deny, dispute, or challenge Plaintiff's exclusive ownership and control, contend or imply that Defendant Prescott Niles has the right to use THE KNACK in commerce, and have used, authorized, promoted, participated in, or benefited from the unauthorized use of THE KNACK and confusing variants thereof.

58.    Doug Fieger was the founder, lead singer, principal public-facing member, and continuing business owner of the musical group professionally known as THE KNACK. Fieger performed and recorded under THE KNACK name for more than thirty years, until his death in 2010.

59.    Fieger was not merely one interchangeable member of THE KNACK. Fieger was the lead vocalist and principal source-identifying voice of the recordings most closely associated with THE KNACK, including the hit recording "My Sharona," and was the key creative, commercial, and public-facing figure through whom the public identified THE KNACK.

60.    Berton Averre, co-writer of "My Sharona," was also a key creative member of THE KNACK. By contrast, Defendant Prescott Niles was the bass player and was not the lead vocalist, principal songwriter of "My Sharona," owner of the name, or primary source-identifying member of THE KNACK, as acknowledged by all parties including the record label Capitol.

61.    At the time Fieger, Averre, Bruce Gary, and Niles entered into the Recording Agreement and related Group Supplement, the parties acknowledged and warranted that Fieger owned the rights to the professional name THE KNACK.

62.    The Group Supplement further provided that if certain members' engagements were terminated, those members would not use the professional name of the group in any commercial or artistic endeavor, and that the professional name would be and remain the property of Doug Fieger.

63.    On or about February 12, 1982, Niles, Gary, and Averre terminated their

membership in THE KNACK and instructed that they be treated as "Leaving Members" under the Recording Agreement.

64.     By leaving the group, Niles ceased being a member of THE KNACK and had no continuing ownership right, control right, or independent right to commercially use THE KNACK as the name, trade name, mark, or dominant source identifier for a new performing group.

65.     For decades after leaving the group, Niles did not commercially use THE KNACK as his own band name, business name, service mark, trade name, or source identifier, nor did Niles have any legal right to said uses.

66.     Instead, with the knowledge of and without objection from Niles and the other Former Members, Fieger continued to operate the business of THE KNACK as his sole proprietorship, controlled the name and related intellectual property, entered into agreements, enforced rights, collected monies payable to THE KNACK, and accounted to the Former Members only for their limited share of net proceeds from the Group Recordings.

67.     Niles repeatedly acknowledged, ratified, accepted, or otherwise acted consistently with Fieger's exclusive ownership and control of THE KNACK for decades.

68.     Niles repeatedly acknowledged these facts by and through a consistent course of conduct over the years, including without limitation the 1982 leaving-member notice, declarations, correspondence, settlement agreements, accounting history, royalty-payment history, absence of objection, admissions, tax/accounting treatment, or other documents.

69.     Following Fieger's death in February 2010, Plaintiff inherited Fieger's rights in and to the business operations, intellectual property, bank accounts, goodwill, trademark rights, and contractual rights associated with THE KNACK, subject only to the limited obligation to account to the Former Members for their pro-rata share of net receipts derived specifically from the Group Recordings.

70.     Plaintiff has continued, without abatement, to conduct the business of THE KNACK, protect the mark, preserve the goodwill, enforce rights, and account to the Former Members as required.

71. Plaintiff is the owner, by inheritance from Fieger via Trust, of U.S. Trademark Registration No. 4,509,278 for THE KNACK, together with the goodwill associated with that mark, including its continuous, uninterrupted use in commerce deeming the mark incontestable.

72. In or about February and March 2026, Defendants began using THE KNACK and confusing variants thereof in commerce, including "Prescott Niles' THE KNACK," "Prescott Niles' The Knack," "The Knack is back," "return of The Knack," #TheKnack, #theknackisback, #mysharona, and related uses in connection with live performances, ticket sales, social media, advertising, press, videos, photographs, interviews, venue promotion, and promotional materials.

73. Defendants' use of THE KNACK falsely suggests that Defendants' new performing group is THE KNACK, is a continuation or re-formation of THE KNACK, or is authorized, sponsored, licensed, approved, or affiliated with Plaintiff.

74. Defendants' use is especially misleading because Fieger, the founding member, lead singer, principal public-facing member, and continuing business owner of THE KNACK, is deceased and cannot be part of Defendants' new performing group.

75. Defendants' use is also misleading because Niles was not the primary source-identifying member of THE KNACK, did not own the name, and repeatedly acknowledged or accepted for decades that he had no right to commercially use THE KNACK as his own band name or business identifier.

76. Plaintiff did not authorize Defendants to use THE KNACK as the name, dominant name, trade name, mark, social media identifier, hashtag, logo, stage identifier, or promotional identifier for Defendants' new performing group.

77. Plaintiff explored settlement discussions only in an effort to avoid litigation, protect the mark, and prevent consumer confusion. No final written license, coexistence agreement, standstill agreement, or other authorization was granted to Defendants.

78. To the extent Defendants claim any temporary, implied, oral, or conditional permission to use THE KNACK, Plaintiff alleges that any such permission was limited, conditional, revocable, and terminated.

79. Defendants have continued to use, threaten to use, or permit the use of THE

KNACK and confusing variants despite Plaintiff's ownership rights, Plaintiff's lack of consent, Plaintiff's objections, and actual confusion among members of the public.

80. Defendants have also threatened to challenge, cancel, restrict, or impair Plaintiff's trademark rights, thereby placing a cloud on Plaintiff's title, ownership, and exclusive right to control THE KNACK.

81. A judicial declaration is necessary and appropriate to resolve the parties' dispute, quiet Plaintiff's title and exclusive commercial rights, prevent continuing confusion, protect the public, and prevent further harm to Plaintiff's ownership, goodwill, business rights, and ability to control THE KNACK name and mark.

82. Plaintiff therefore seeks a declaration that:

a. Plaintiff owns and controls the name, mark, goodwill, business rights, and commercial rights associated with THE KNACK;

b. THE KNACK was and remains the property of Doug Fieger and, following his death, Plaintiff as his successor-in-interest;

c. Defendant Prescott Niles has no ownership interest in THE KNACK and no independent right to commercially use THE KNACK as the name, dominant name, trade name, service mark, source identifier, or promotional identifier of a new performing group;

d. Defendants have no license, consent, or authorization to use THE KNACK;

e. Any alleged temporary, implied, oral, or conditional permission was limited, revocable, and terminated;

f. Defendants may not use THE KNACK, "Prescott Niles' The Knack," or any confusingly similar name, mark, logo, phrase, hashtag, social media handle, domain name, trade name, stage identifier, or promotional identifier in connection with live performances, advertising, ticket sales, merchandise, media appearances, social media, or other commercial activity;

g. Defendant Niles is contractually barred from using THE KNACK in any commercial or artistic endeavor;

h.　　Plaintiff has the right to police, enforce, and protect THE KNACK name and mark against Defendants and any third parties acting in concert with them; and

i.　　Such other and further declaratory relief as the Court deems just and proper.

83.　　Plaintiff further seeks preliminary and permanent injunctive relief restraining Defendants, and all persons acting in concert or participation with them, from:

a.　　Using THE KNACK, "Prescott Niles' The Knack," or any confusingly similar name, mark, logo, phrase, hashtag, social media handle, domain name, trade name, stage identifier, or promotional identifier;

b.　　Advertising, promoting, booking, presenting, performing, selling tickets to, or conducting any live performance using THE KNACK or any confusingly similar name or mark;

c.　　Representing, implying, or allowing the public to believe that Defendants' new performing group is THE KNACK, is a continuation or re-formation of THE KNACK, or is authorized, sponsored, licensed, approved, or affiliated with Plaintiff;

d.　　Using the classic THE KNACK logo, stylized lettering, or other source-identifying materials associated with Plaintiff's mark;

e.　　Using THE KNACK on drum heads, guitar picks, merchandise, promotional items, stage materials, social media, video titles, venue listings, ticketing pages, press materials, or other advertising or promotional materials;

f.　　Using #TheKnack, #theknackisback, or similar source-identifying hashtags in connection with Defendants' performances or commercial activities;

g.　　Causing, encouraging, assisting, permitting, or failing to correct third-party uses that identify Defendants' new performing group as THE KNACK; and

h.　　Otherwise interfering with Plaintiff's ownership, control, enforcement, and exclusive commercial use of THE KNACK.

84.　　Plaintiff also seeks an order requiring Defendants to remove, disable, recall, correct, or destroy all advertising, social media posts, ticketing pages, videos, photographs, poster images and flyers, merchandise, promotional items, venue listings, stage materials, and other

materials using THE KNACK or any confusingly similar name or mark.

85.     Plaintiff further seeks an order requiring Defendants to provide corrective notices to venues, promoters, booking agents, ticketing platforms, social media platforms, media outlets, fans, and other affected third parties, advising that Defendants are not THE KNACK and are not authorized, sponsored, licensed, approved, or affiliated with Plaintiff.

86.     Unless Defendants are restrained and enjoined, Plaintiff will suffer continuing and irreparable harm, including loss of control over THE KNACK name and mark, loss of goodwill, consumer confusion, reputational harm, interference with Plaintiff's business rights, and impairment of Plaintiff's ability to protect and preserve Fieger's legacy and THE KNACK brand.

## SECOND CAUSE OF ACTION

### Federal Trademark Infringement
### Lanham Act, 15 U.S.C. § 1114

### Against All Defendants

87.     Plaintiff refers to, realleges, and incorporates by reference each of the allegations set forth above and below as though fully set forth herein.

88.     Plaintiff, by inheritance from Fieger via Trust, owns valid and protectable rights in the federally registered trademark THE KNACK, including U.S. Trademark Registration No. 4,509,278, together with the goodwill associated with that mark, including its continuous, uninterrupted use in commerce deeming the mark incontestable.

89.     Defendants have used Plaintiff's THE KNACK mark, and colorable imitations thereof, in commerce without Plaintiff's authorization, including in connection with live performances, ticket sales, social media accounts, poster images and flyers, videos, interviews, venue promotions, promotional photographs, hashtags, and other advertising.

90.     Defendants' unauthorized uses include, without limitation, "THE KNACK," "The Knack is back," "return of The Knack," #TheKnack, #theknackisback, "Prescott Niles' THE KNACK," "Prescott Niles' The Knack," and related uses.

91.     Defendants' use of THE KNACK is likely to cause confusion, mistake, or deception as to the source, sponsorship, affiliation, connection, or approval of Defendants'

performances, services, advertising, and commercial activities.

92. Actual confusion has occurred, including fan complaints and public statements reflecting the belief that Defendants' performances were performances by, or authorized by, THE KNACK, creating confusion where founding member and frontman Doug Fieger is deceased.

93. Defendants' conduct has caused and is likely to continue causing harm to Plaintiff, including loss of control over the mark, damage to goodwill, reputational harm, consumer confusion, and loss of business value.

94. Defendants acted knowingly, intentionally, willfully, and in bad faith after notice of Plaintiff's rights.

95. Plaintiff is entitled to injunctive relief, Defendants' profits, damages, corrective relief, costs, attorneys' fees, and all other relief available under the Lanham Act.

## THIRD CAUSE OF ACTION

### Federal False Designation of Origin, False Association, and Passing Off
### Lanham Act, 15 U.S.C. § 1125(a)

#### Against All Defendants

96. Plaintiff refers to, realleges, and incorporates by reference each of the allegations set forth above and below as though fully set forth herein.

97. Defendants used words, names, symbols, devices, false designations of origin, false descriptions, and misleading representations in commerce in connection with Defendants' services and commercial activities.

98. Defendants' use of THE KNACK and related wording falsely suggested that Defendants' new performing group was THE KNACK, was a continuation of THE KNACK, or was authorized, sponsored, approved, licensed, or affiliated with Plaintiff.

99. Defendants' public statements and promotional materials included, without limitation, statements that "The Knack is back," references to "re-forming" THE KNACK, references to Niles as a "current Knack member," references to Starr being "the new singer for The Knack," and promotional uses emphasizing THE KNACK as the dominant source-identifying name.

100.   Defendants also failed to correct third-party statements, media statements, venue announcements, and promotional uses referring to Defendants' act as THE KNACK.

101.   Defendants' conduct is likely to cause confusion, mistake, or deception as to the origin, sponsorship, approval, affiliation, or association of Defendants' services and commercial activities.

102.   Plaintiff has been and is likely to be damaged by Defendants' conduct, including harm to goodwill, reputation, business value, and control over THE KNACK mark and legacy.

103.   Plaintiff is entitled to injunctive relief, damages, Defendants' profits, corrective relief, costs, attorneys' fees, and all other available relief.

## FOURTH CAUSE OF ACTION

### Federal Unfair Competition
### Lanham Act, 15 U.S.C. § 1125(a)

### Against All Defendants

104.   Plaintiff refers to, realleges, and incorporates by reference each of the allegations set forth above and below as though fully set forth herein.

105.   Defendants engaged in unfair competition by using Plaintiff's THE KNACK mark, goodwill, legacy, and source-identifying materials to promote Defendants' own services and commercial activities.

106.   Defendants' advertising and promotional conduct was false, misleading, and likely to deceive the public into believing that Defendants' new performing group was THE KNACK or was authorized, sponsored, approved, or affiliated with Plaintiff.

107.   Defendants' conduct diverted public attention and commercial value from Plaintiff's mark and goodwill to Defendants' unauthorized performances and promotions.

108.   Defendants' conduct has caused and will continue to cause irreparable harm unless enjoined.

109.   Plaintiff is entitled to injunctive relief, damages, Defendants' profits, corrective relief, costs, attorneys' fees, and all other available relief.

## FIFTH CAUSE OF ACTION

### California Unfair Competition
### Bus. & Prof. Code § 17200

### Against All Defendants

110. Plaintiff refers to, realleges, and incorporates by reference each of the allegations set forth above and below as though fully set forth herein.

111. Defendants engaged in unlawful, unfair, and fraudulent business acts and practices.

112. Defendants' conduct is unlawful because it violates, among other laws, the Lanham Act, California trademark and unfair competition law, California false advertising law, and California's Truth in Music Advertising Act.

113. Defendants' conduct is unfair because Defendants knowingly used Plaintiff's mark, goodwill, and legacy to promote and sell unauthorized live performances and related commercial activities.

114. Defendants' conduct is fraudulent because members of the public were likely to be deceived into believing that Defendants' new performing group was THE KNACK or was authorized, sponsored, approved, or affiliated with Plaintiff.

115. Plaintiff has suffered injury in fact and lost money or property as a result of Defendants' conduct, including without limitation, legal enforcement costs, lost business opportunities, harm to goodwill, and diverted revenue.

116. Plaintiff seeks injunctive relief, restitution, and all other relief available under Bus. & Prof. Code § 17200.

## SIXTH CAUSE OF ACTION

### California False Advertising / Truth in Music Advertising Predicate
### Bus. & Prof. Code §§ 17500, 17537.12

### Against All Defendants

117. Plaintiff refers to, realleges, and incorporates by reference each of the allegations set forth above and below as though fully set forth herein.

118. Defendants advertised and promoted live musical performances in California using THE KNACK and related names, words, symbols, imagery, and statements.

119. Defendants' advertising and promotion were false, deceptive, and misleading because they suggested that Defendants' performing group was THE KNACK or was authorized, sponsored, approved, or affiliated with Plaintiff.

120. Defendants' challenged uses included, without limitation, poster images and flyers, social media posts, venue promotions, ticket promotions, photographs, video content, interviews, hashtags, and stage/promotional branding.

121. Defendants' conduct also violated California's Truth in Music Advertising Act because Defendants advertised or conducted live musical performances using a false, deceptive, or misleading affiliation, connection, or association between Defendants' performing group and the recording group professionally known as THE KNACK.

122. Although Defendant Niles was formerly a member of THE KNACK, Plaintiff alleges that Niles does not have the legal right to use THE KNACK name for a new performing group because he left the group, acknowledged Fieger's ownership, and was contractually barred from using the professional name in any commercial or artistic endeavor.

123. Defendants' performances were not clearly advertised as a tribute, salute, or other non-confusing performance.

124. Defendants' performances and promotions were not authorized by Plaintiff.

125. Plaintiff seeks injunctive relief, restitution, corrective relief, and all other available relief, including as a predicate for Plaintiff's UCL claim.

**SEVENTH CAUSE OF ACTION**

**Breach of Written Contract**

**Against Defendant Prescott Niles**

126. Plaintiff refers to, realleges, and incorporates by reference each of the allegations set forth above and below as though fully set forth herein.

127. On or about February 22, 1979, Fieger, Averre, Gary, Niles, and Capitol entered

into the Recording Agreement and related Group Supplement.

128.   The Group Supplement provided that the professional name of the group, THE KNACK, was and would remain the property of Doug Fieger, and that leaving or terminated members would not use the professional name in any commercial or artistic endeavor.

129.   On or about February 12, 1982, Niles and other Former Members terminated their membership in THE KNACK and became Leaving Members under the Recording Agreement.

130.   Niles repeatedly acknowledged, ratified, accepted, or otherwise acted consistently with his position as a Leaving Member under the Recording Agreement through a consistent course of conduct over the years, including without limitation the 1982 leaving-member notice, declarations, correspondence, settlement agreements, accounting history, royalty-payment history, absence of objection, admissions, tax/accounting treatment, or other documents.

131.   Following Fieger's death, Plaintiff inherited Fieger's rights in the business operations, intellectual property, bank accounts, goodwill, trademark rights, and contractual rights associated with THE KNACK via Trust.

132.   Plaintiff's rights were further affirmed via a settlement agreement signed by Niles, and by Capitol Records affirming Plaintiff as Fieger's sole heir and owner of all rights in the business operations, intellectual property, bank accounts, goodwill, trademark rights, and contractual rights associated with THE KNACK.

133.   Plaintiff and/or Fieger performed all obligations required under the agreement, except to the extent performance was excused.

134.   Niles breached the agreement by using THE KNACK and confusing variants thereof in commercial and artistic endeavors, including live performances, advertising, promotion, social media, interviews, ticket sales, and related commercial activities.

135.   Niles's breach caused Plaintiff harm, including loss of control over THE KNACK name, consumer confusion, reputational harm, enforcement costs, and damage to goodwill.

136.   Plaintiff is entitled to damages, injunctive relief, declaratory relief, and all other relief available by law or equity.

## EIGHTH CAUSE OF ACTION

### Common Law Trademark Infringement

### Against All Defendants

137.   Plaintiff refers to, realleges, and incorporates by reference each of the allegations set forth above and below as though fully set forth herein.

138.   Plaintiff owns valid and protectable common law trademark rights in THE KNACK arising from continuous use in commerce, public recognition, and the goodwill associated with Fieger's ongoing business enterprise and Plaintiff's continuation of that enterprise.

139.   Defendants used THE KNACK and confusingly similar names, phrases, symbols, and promotional identifiers in commerce without Plaintiff's authorization.

140.   Defendants' use is likely to cause confusion, mistake, or deception among consumers concerning the source, sponsorship, approval, affiliation, or association of Defendants' performances and commercial activities.

141.   Defendants' use has caused and is likely to continue causing harm to Plaintiff's goodwill, reputation, business interests, and control over THE KNACK mark.

142.   Plaintiff is entitled to injunctive relief, damages, Defendants' profits, and all other available relief.

## NINTH CAUSE OF ACTION

### Common Law Unfair Competition / Passing Off

### Against All Defendants

143.   Plaintiff refers to, realleges, and incorporates by reference each of the allegations set forth above and below as though fully set forth herein.

144.   Plaintiff and Fieger invested substantial time, skill, money, labor, and creative effort in developing THE KNACK name, mark, goodwill, business, and public recognition.

145.   Defendants appropriated Plaintiff's name, mark, goodwill, and public recognition by using THE KNACK and confusing variants to promote Defendants' own performances and commercial activities.

146. Plaintiff did not authorize Defendants' use.

147. Defendants' conduct was likely to deceive the public into believing that Defendants' new performing group was THE KNACK or was authorized, sponsored, approved, or affiliated with Plaintiff.

148. Defendants' conduct caused and is likely to continue causing injury to Plaintiff, including harm to goodwill, reputation, business value, and control over THE KNACK mark.

149. Plaintiff is entitled to injunctive relief, damages, Defendants' profits, corrective relief, and all other available relief.

### TENTH CAUSE OF ACTION

### Contributory and Vicarious Trademark Infringement

### Against Defendants Other Than Niles and Against
### Entity Defendants as Supported by Proof

150. Plaintiff refers to, realleges, and incorporates by reference each of the allegations set forth above and below as though fully set forth herein.

151. Plaintiff is informed and believes, and based thereon alleges, that Defendants Prescott Niles' The Knack Partnership, Kramer, Starr, Lowrey, and/or other Defendants knowingly participated in, induced, caused, promoted, assisted, controlled, or materially contributed to the infringing use of THE KNACK. Plaintiff is informed and believes that Does 1 through 35 include additional persons or entities whose roles, involvement, and potential responsibility require further factual development. Notwithstanding the foregoing, Plaintiff has named the Defendants whose involvement and legal responsibility can presently be alleged based on facts currently available, and reserves the right to seek leave to amend, if appropriate, after further investigation and discovery.

152. Plaintiff is informed and believes, and based thereon alleges, that these Defendants knew or had reason to know that Plaintiff claimed ownership and control of THE KNACK and that Defendants' use was unauthorized.

153. These Defendants nevertheless continued to promote, advertise, produce, perform, distribute, post, publish, or benefit from infringing uses of THE KNACK.

154. Plaintiff is informed and believes, and based thereon alleges, that certain Defendants had the right and ability to supervise, control, approve, remove, correct, or stop the infringing uses and received a direct financial benefit from those uses.

155. Plaintiff is further informed and believes and based thereon alleges, that Defendants took part in promotional conduct, management, and booking roles and received a direct financial benefit from those uses.

156. As a result, these Defendants are contributorily and/or vicariously liable for trademark infringement and related unfair competition.

157. Plaintiff is entitled to injunctive relief, damages, Defendants' profits, corrective relief, costs, attorneys' fees, and all other available relief.

## ELEVENTH CAUSE OF ACTION

### Federal Trademark Dilution
### Lanham Act, 15 U.S.C. § 1125(c)

### Against All Defendants

158. Plaintiff refers to, realleges, and incorporates by reference each of the allegations set forth above and below as though fully set forth herein.

159. Plaintiff owns the famous and distinctive mark THE KNACK.

160. Long before Defendants' challenged conduct, THE KNACK became widely recognized by the general consuming public of the United States through decades of nationwide commercial use, nationally distributed recordings, live performances, publicity, radio play, streaming, licensing, media coverage, and enduring public recognition.

161. THE KNACK is associated with famous and widely recognized recordings, including "My Sharona," and with Fieger's distinctive lead vocals, performances, and goodwill.

162. The Knack has achieved public recognition by the general consuming public, having sold over 6 million records worldwide, with the album "Get the Knack" accounting for well over 2 million copies globally, and receiving 2x multi-platinum certification status in the United States. The band's signature hit, "My Sharona," written by Fieger and Averre, spent six weeks at No. 1 on the US Billboard Hot 100, and went gold (500,000 units sold) faster than any

debut single on Capitol Records since "I Want To Hold Your Hand" by the Beatles in 1964.

163.    Plaintiff's mark became famous before Defendants began the challenged uses in or about 2026.

164.    Defendants began using THE KNACK and confusingly similar variants in commerce after THE KNACK became famous.

165.    Defendants' use is likely to dilute THE KNACK by blurring because it creates an association between Defendants' unauthorized new performing group and Plaintiff's famous mark, thereby impairing the distinctiveness and exclusive source-identifying power of THE KNACK.

166.    Defendants' use is also likely to dilute THE KNACK by tarnishment because it associates Plaintiff's famous mark with unauthorized performances, misleading promotions, lack of quality control, public confusion, fan complaints, and conduct outside Plaintiff's approval or supervision.

167.    Defendants acted willfully and with intent to trade on the recognition of THE KNACK, including by using THE KNACK, "The Knack is back," #TheKnack, #theknackisback, #mysharona, original-band imagery, and other legacy references.

168.    Plaintiff is entitled to injunctive relief and, because Defendants' conduct was willful, all additional remedies available under the Lanham Act.

### TWELFTH CAUSE OF ACTION

#### Slander of Title

#### Against Defendants Niles, Kramer and Lowrey

169.    Plaintiff refers to, realleges, and incorporates by reference each of the allegations set forth above and below as though fully set forth herein.

170.    Plaintiff owns and controls THE KNACK name, mark, goodwill, and related business rights.

171.    Plaintiff is informed and believes, and based thereon alleges, that Defendants made false statements to third parties claiming or implying that Plaintiff did not own or control

THE KNACK, that Niles had the right to use THE KNACK, or that Plaintiff's ownership documents or rights were invalid.

172. For example, on March 12, 2026, Defendant Kramer posted a talk show interview on the phone with Defendant Niles. Niles stated "Besides being a former Knack and now a current Knack member, we re-formed The Knack and I'm delighted that you will be lead guitarist and vocalist at Prescott Niles' The Knack." Defendant Kramer tried to emphasize "Prescott Niles' The Knack" after Niles' comment, but ended the video with "We're bringing the Knack back, The Knack is back" and played out the recording with part of the original The Knack recording of "My Sharona."

173. On or about June 5, 2026, the night before the show at The Strat, Defendants Niles and Lowrey appeared on More Fox 5 in Las Vegas. During the interview, the news reporter says, "How does it feel to be playing with The Knack"? Neither Defendant Niles nor Defendant Lowrey corrected him. During the interview, Defendant Niles further fanned the flame by insinuating that he was at Fieger's bedside when he died, which was not true. The reporter then stated, "You guys obviously kept the band going, and it's with you now." Again, Defendant Niles made no effort to correct. Instead, Defendant Niles said that his manager and agent started to talk to him and said he was contemplating doing this for a while but it didn't feel right, but now it felt right.

174. The statements were false because Plaintiff owns and controls THE KNACK and Defendants have no right to use the name without Plaintiff's authorization.

175. The statements disparaged Plaintiff's title, ownership, and control of THE KNACK.

176. The statements were published to third parties, including media outlets and podcasts, and, upon further information and belief, venues, ticketing platforms, business partners, or others.

177. Defendants made the statements maliciously, knowingly, recklessly, or without privilege.

178. Plaintiff suffered pecuniary harm as a result, including lost business relationships,

corrective costs, enforcement costs, and other monetary harm in an amount according to proof.

179.    Plaintiff is entitled to damages and all other available relief.

### PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for judgment against Defendants, and each of them, as follows:

1.    For a preliminary and permanent injunction prohibiting Defendants and all persons acting in concert with them from using THE KNACK, "Prescott Niles' The Knack," or any confusingly similar name, mark, logo, phrase, hashtag, social media handle, domain name, promotional identifier, or trade name;

2.    For an order requiring Defendants to remove, disable, recall, correct, or destroy all infringing and misleading advertising, promotions, social media posts, videos, poster images and flyers, ticketing pages, merchandise, promotional items, stage materials, and related materials;

3.    For an order requiring corrective notices to venues, promoters, ticketing platforms, social media platforms, media outlets, fans, and other affected third parties;

4.    For a declaration that Plaintiff owns and controls THE KNACK name, mark, goodwill, and related rights;

5.    For a declaration that Defendants have no right or license to use THE KNACK;

6.    For damages according to proof;

7.    For disgorgement of Defendants' profits;

8.    For restitution as permitted by law;

9.    For an accounting of all revenues, profits, ticket sales, performance fees, merchandise, promotional income, sponsorship income, licensing income, and other benefits derived from Defendants' unauthorized use of THE KNACK;

10.    For enhanced damages and profits based on willful infringement;

11.    For attorneys' fees and costs as permitted by law;

12.    For pre-judgment and post-judgment interest; and

13.    For such other and further relief as the Court deems just and proper.

Dated:  June 29, 2026                              KINNEY LAW, P.C.


By:    /Christiane Kinney
       Christiane C. Kinney
       Attorneys for Plaintiff
       Beth Fieger Falkenstein

**DEMAND FOR JURY TRIAL**

Plaintiff hereby demands a trial by jury in the within action upon all causes of action for which trial by jury is authorized by law.

Dated:  June 29, 2026                    KINNEY LAW, P.C.


                            By:    /Christiane Kinney
                                   Christiane C. Kinney
                                   Attorneys for Plaintiff
                                   Beth Fieger Falkenstein